Joshua S. Evett (ISB #5587)
ELAM & BURKE, P.A.
251 East Front Street, Suite 300
Post Office Box 1539
Boise, Idaho 83701
Telephone:  (208) 343-5454
Facsimile:  (208) 384-5844
jse@elamburke.com

Attorneys for Dr. DeJong

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANN DeJONG, M.D., | |
| Dr. DeJong, | Case No. |
| vs. | COMPLAINT |
| IDAHO STATE BOARD OF MEDICINE | |
| Defendant. | |

Dr. DeJong Ann DeJong, M.D. ("Dr. DeJong"), by and through her attorneys of record, Elam & Burke, P.A., for causes of action against Defendant Idaho State Board of Medicine (the "IBOM") complains and alleges as follows:

I. INTRODUCTION

1.      The Supreme Court recently reaffirmed that state licensing boards made up of active members of the licensed profession, like the Defendant, are not immune from antitrust laws when they take anticompetitive actions without the active supervision of the State.

COMPLAINT - 1

2.      The IBOM disciplined Dr. DeJong on September 21, 2015 for practicing telemedicine, even though numerous Idaho health providers had practiced telemedicine for the better part of a decade, including St. Alphonsus Regional Medical Center, which started its telemedicine program in 2007 with grant funding from the U.S. Army's Telemedicine and Advanced Technology Research Center.  Dr. DeJong contends she was disciplined because she worked for an out of state telehealth company, Consult a Doctor, Inc. ("CADR").

3.      Telehealth services offer patients access to highly qualified, in-state-licensed physicians through telecommunications technologies.  Telehealth providers are generally available 24 hours per day, 365 days per year, for a fraction of the cost of a visit to a physician's office, urgent care center, or hospital emergency room.

4.      The IBOM knowingly permitted the operation of telehealth in Idaho for many years.  Nevertheless, it punished Dr. DeJong for the practice because she worked for an out of state telehealth provider.

5.      The IBOM's discipline of Dr. DeJong is unsupported and pretextual.  For many decades, physicians have used the telephone to take turns providing "on-call" coverage, diagnosing and, where appropriate, treating other physicians' patients by phone when those patients need care outside of normal business hours.  The IBOM has never suggested that traditional, phone-based on-call arrangements threaten patient safety.  As the various exhibits to this Complaint demonstrate, Idaho health providers have provided telemedicine services for more than a decade with no repercussions.[1]

---

[1] *See* Exhibit A ("The Robot Doctor Will See You Now," *The Idaho Statesman*, 6/24/2011),

COMPLAINT - 2

6.      For many years in advance of Dr. DeJong's disciplining, and after, the IBOM has

been comprised of a majority of "market participants," whose interpretation of statutes and rules

that did not expressly prohibit or in any way proscribe tele-medicine were unsupervised by the

State of Idaho.  The IBOM, without a clear statutory command or supervision by the State of

Idaho, decided to permit in-state providers to practice tele-medicine while disciplining out-of-

state providers for practicing tele-medicine.

## II.  JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over Dr. DeJong's Sherman Act claims.

*See* 28 U.S.C. § 1337(a); *see also id.* § 1331.

8.      The Court has jurisdiction to award damages under Clayton Act § 4 and to render

injunctive relief under Clayton Act § 16.  *See* 15 U.S.C. §§ 15, 26.

9.      The Court has personal jurisdiction over the IBOM because it is located and

regularly conducts business in Idaho.

10.     Venue lies with this Court because the IBOM has its principal place of business

and headquarters in Boise, Idaho, and a substantial part of the events giving rise to Dr. DeJong's

claims occurred in Idaho.  *See* 28 U.S.C. § 1391(b)(1)&(2); 15 U.S.C. § 15(a).

---

Exhibit B ("Utilizing TeleMedicine to Improve Access to Medical Care in Idaho," Presentation
for the Idaho health Care Task Force, 9/10/2012), Exhibit C (Idaho Hospital Association awarded
its "Excellence in Patient Care Award" to Casey Meza, CEO of St. Mary's Hospital and Clinic
and Clearwater Valley Hospital, for Telehealth utilization), Exhibit D ("North Idaho Hospitals
Land Grant," *The Coeur d'Alene Press*, 1/27/2011), and Exhibit E ("Idaho Behavioral Health

### III.  THE PARTIES

11.     Dr. DeJong is the holder of an Idaho license to practice medicine and surgery, License No. M-11037, issued by the IBOM on June 23, 2010.

12.     Dr. DeJong is also licensed to practice medicine in several other states.

13.     Dr. DeJong has never resided in Idaho.

14.     Pursuant to the Medical Practices Act, codified in Title 54, Chapter 18 of the Idaho Code, the IBOM regulates the practice of medicine in the State of Idaho.

15.     Pursuant to Idaho Code Section 54-1805, the IBOM is comprised of ten (10) members consisting of seven physicians including one osteopathic physician, two public members, and the director of the Idaho state police or the director's designated agent.

16.     The IBOM's mission statement is "the fair and impartial application and enforcement of the Practice Acts within the jurisdiction of the Idaho Board of Medicine."

17.     In approximately early February 2012, Dr. DeJong became affiliated with CADR in Idaho.

18.     CADR was a telemedicine company.

19.     On or about February 9, 2012, Dr. DeJong had a telephonic encounter with a patient ("subject incident").

20.     The patient had a preexisting relationship with CADR.

21.     Dr. DeJong wrote a prescription for a common antibiotic that was never filled.

---

Optimizes Med Management Visits Using Telehealth").

COMPLAINT - 4

22.     At the time of the subject incident, Idaho did not have any specific statutes or administrative rules in place governing the practice of telemedine or telehealth (collectively referred to herein as "telemedicine").

23.     During a meeting in March 2012, the IBOM discussed sending cease and desist letters ("cease and desist letter") to telephone services physicians providing legend drugs to Idaho patients based solely on telephone consultations.

24.     IBOM did not send – and Dr. DeJong did not receive – a cease and desist letter.

25.     Dr. DeJong received an investigation letter dated February 23, 2012 ("investigation letter"), from the IBOM's quality assurance specialist indicating that she may have issued a prescription for a legend drug.

26.     The investigation letter further indicated that formal actions would be taken if a proven pattern of misconduct is confirmed.

27.     A few months later, Dr. DeJong received a letter dated June 18, 2012, from the IBOM's attorney enclosing a proposed stipulation and order which alleged that she violated laws relating to controlled substances.

28.     Dr. DeJong prescribed an antibiotic during the subject incident not a narcotic. Accordingly, Dr. DeJong would not sign the stipulation.

29.     On February 1, 2013, the IBOM initiated disciplinary proceedings against Dr. DeJong by filing a complaint.

30.     On July 30, 2013, the contested disciplinary proceedings proceeded to a hearing.

COMPLAINT - 5

31.     On November 13, 2013, Recommended Findings of Fact and Conclusions of Law were issued by the IBOM.

32.     On January 2, 2014, a Final Order was signed by the IBOM Chairman.

33.     The Final Order expressly punished Dr. DeJong for practicing telemedicine in Idaho, restricting her license.

34.     On January 17, 2014, the IBOM submitted the initial report concerning its Final Order to the National Practitioners Data Base ("NPDB").

35.     On January 17, 2014, Dr. DeJong submitted a motion for reconsideration to the IBOM.

36.     On February 5, 2014, the motion for reconsideration was denied.

37.     During the 2012-2014 timeframe, when the subject incident and disciplinary proceedings occurred, the IBOM claimed that it did not recognize telemedicine as an authorized model of practice, even though many of its board members either practiced telemedicine themselves, worked for providers that provided telemedicine, or knew of other in-state providers who were providing telemedicine services.

38.     In an early 2014 newsletter, the IBOM published a statement which recognized telemedicine as a method of delivery of care and acknowledged that some specialties lend themselves well to remote delivery.  *See* Exhibit F  (The Report, Vol. 1, Issue , p. 1 (2014)).

39.     In March 2014, the IBOM declined to meet with CADR, an out of state telemedicine provider, because existing Idaho Code prohibited the model of practice.

40.     CADR then withdrew its business from Idaho.

COMPLAINT - 6

41.     Despite the IBOM's claim that telemedicine was not an authorized model of practice, health care providers have been practicing telemedicine in Idaho since at least 2005 when a group of hospitals in eastern Idaho landed a grant to establish a telehealth network.

42.     Awards for telehealth have been made to Idaho providers for years with no discipline.

43.     Media coverage of telehealth in Idaho has been widespread long before Dr. DeJong's disciplinary proceed with no repercussions.

44.     Idaho doctors have essentially practiced telemedicine for decades by providing medical treatment telephonically outside of a clinical setting.

45.     In 2013, a group of stakeholders began studying the status of telehealth in Idaho.

46.     In 2014, the Idaho legislature adopted House Concurrent Resolution 46 ("HCR 46") instructing the Idaho Department of Health and Welfare to convene a Telehealth Council.

47.     The purpose of the Telehealth Council was to coordinate and develop a comprehensive set of standards, policies, rules and procedures for the use of telehealth and telemedicine in Idaho.

48.     The Telehealth Council was comprised of physicians, hospitals, payers, regulators (including individuals representing the IBOM), and rural health representatives.

49.     On December 5, 2014, after participating on the Telehealth Council, the IBOM adopted Guidelines for Appropriate Regulation of Telemedicine (the "2014 Guidelines").

50.     The IBOM's 2014 Guidelines recognized the pre-existing practice of telemedicine in Idaho.

COMPLAINT - 7

51.     The adoption of these 2014 Guidelines occurred less than a year after the IBOM issued its Final Order from the disciplinary proceedings barring Dr. DeJong from providing medical care to Idaho patients via telehealth modalities.

52.     In 2015, the Idaho legislature enacted House Bill 189 ("HB 189"), also known as the Idaho Telehealth Access Act ("Act").

53.     The Act became effective on July 1, 2015, and was codified in Title 54, Chapter 57, of the Idaho Code.

54.     Following the 2015 legislative session, the IBOM promulgated administrative rules, IDAPA 22.01.15.001 et seq., relating to telehealth services.

55.     These rules were subsequently approved by the legislature in 2016 and became effective on March 25, 2016.

56.     In April 2015, the IBOM's attorney suggested to Dr. DeJong's attorney that the IBOM might be willing to entertain a petition to modify the Final Order in light of the legislature's passage of the Act.

57.     The "license restriction" included in the IBOM's Final Order prompted Dr. DeJong's attorney to submit a Petition to Modify to the IBOM on May 20, 2015.

58.     The license restriction and the corresponding NPDB entry was being looked at by the American Board of Family Medicine ("ABFM") for immediate revocation of Dr. DeJong's ABFM certification.

59.     At the IBOM's quarterly meeting in September 2015, the Final Order was amended.

COMPLAINT - 8

60.     The IBOM's Amended Final Order of September 21, 2015 ("Amended Final Order"), reprimanded Dr. DeJong for "using telemedicine technology and consulting and interacting with an Idaho resident patient with whom she did not have a pre-existing physician/patient relationship."

61.     The Amended Final Order instructed Dr. DeJong to comply with the "new Idaho Telehealth Access Act" when providing telehealth services to patients located in Idaho.

62.     Dr. DeJong has complied with the Final Order and the Amended Final Order.

63.     After the Amended Final Order was entered, the IBOM incorrectly reported the disciplinary proceeding to the NPDB, making it appear as if there were multiple new disciplinary entries.

64.     In April 2016, NPDB requested that the IBOM correct its reporting related to the disciplinary proceeding.

65.     The Amended Final Order has been a professional and economic blow to Dr. DeJong and has significantly affected Dr. DeJong's ability to obtain employment and earn a living.

66.     The IBOM's reprimand has prompted reciprocal inquiries and investigations by medical boards in other states where Dr. DeJong is licensed, including Arizona, California, Minnesota, Montana, North Dakota, South Dakota, Wisconsin, and Nevada.

67.     Dr. DeJong lost her job in California due to a reciprocal investigation and multiple incorrect NPDB entries prompted by the Idaho action.

COMPLAINT - 9

68.     Because of the limitations Dr. DeJong has faced in seeking employment, she has had to accept locum tenens work leading to a nomadic lifestyle that she never envisioned for her career.

69.     In March 2017, Dr. DeJong requested that the IBOM rescind the Amended Final Order, the Final Order and remove all corresponding NPDB entries.

70.     In June 2017, the IBOM considered Dr. DeJong's request.

71.     In a letter from the IBOM's attorney dated July 27, 2017, the IBOM declined to take action.

72.     In-state doctors and hospitals openly practiced telemedicine years before Dr. DeJong's disciplinary proceeding, and continued to practice without discipline.

73.     The tolerance and accommodation the IBOM exercised with in-state providers, however, was not shown to Dr. DeJong, an out-of-state physician employed by CADR.

## IV.  RELEVANT MARKETS

74.     Product Markets.

a.      <u>Payor Market</u>.  Dr. DeJong competes with physicians for "in-network" status with third-party payors, and competes for utilization within that network.

b.      <u>Physician Services Market</u>.  Dr. DeJong competes with other physicians in diagnosing and treating medical issues.  Dr. DeJong competes with office-based physicians, urgent care center physicians, and hospital-based physicians, as well as with other telehealth services in this market.

COMPLAINT - 10

75.     <u>Geographic Market</u>.  The relevant geographic market is Idaho. By law, to treat a patient in Idaho, a physician must have a medical license from the IBOM and abide by other IBOM regulations.

## V. ADDITIONAL FACTUAL ALLEGATIONS

**A.**     <u>**Patients' Use of Telehealth**</u>

76.     Patients typically gained access to CADR through their employer or another organization with an agreement with CADR to make the CADR service available to its members in return for a low monthly per-member subscription fee.

77.     Telehealth has long served unmet needs in the United States.  On average, doctors' offices are closed 76% of the time during the week, the average wait time to make a doctor's appointment is three weeks, the average wait time in a physician's waiting room is 23 minutes, and 75% to 90% of doctor's visits originate from stress factors.

78.     Additionally, the top three emergency room visits in 2012 were for ear, sinus, and upper respiratory infections.

79.     The American Medical Association has concluded that as many as four of all five emergency room, urgent care, and doctor office visits could be better handled over phone.

80.     CADR has provided multiple ways for its members to connect with physicians, including direct call center contact, requesting a physician via the member portal, secure email, chat, video, and mobile application.  Typically, CADR members can consult with a physician within less than 90 seconds of initial contact.

81.     CADR members have the option of providing photographs and medical records to CADR's system for inclusion with their medical history.

82.     CADR's high enrollment numbers reflect the simple fact that telehealth is highly attractive to patients for the following reasons.

       a.     Some patients prefer the privacy and convenience of talking with a doctor in their home, rather than going to an office and spending time in a waiting room filled with other patients and germs.

       b.     Some patients find telehealth attractive because it means that they do not need to take time off from work or other commitments, or to travel long distances in order to consult with a physician.

       c.     Some patients prefer telehealth because it allows them to receive treatment faster than other alternatives.  CADR makes telehealth consultations available 24 hours per day, 365 days per year.  Approximately half of CADR's consultations occur outside of normal business hours (one-third occur on weekends or holidays alone), when most physicians' offices are closed.

       d.     Still other patients prefer telehealth because it is less expensive than the alternatives.  CADR's medical services are almost always more accessible and priced substantially lower than the conventional alternatives, including a trip to the emergency room or urgent-care facility, or an in-office visit, enabling both payors and clients to pay less for safe and efficient healthcare.

83.     For those patients with acute but non-emergency conditions who would go to emergency rooms in the absence of telehealth, there is real value in permitting the option of telehealth rather than diverting these patients to emergency rooms.  A 2012 study by the American College of Emergency Physicians found that 85% of Americans who visited the emergency room did so because they could not wait to see their regular medical provider, and more than 50% of those visits were for non-emergency issues.  Allowing patients with acute but non-emergency conditions the option of being treated through telehealth, if appropriate, helps to reduce emergency room backlogs, so that patients with true emergencies receive treatment faster.

84.     To take another example, for the roughly 13% of patients who would forgo care entirely in the absence of telehealth, there are obvious adverse medical consequences of a rule effectively preventing telehealth consultations.  These patients, who might forego care because they do not believe that their condition is urgent enough to warrant paying for an in-person appointment or a trip to the emergency room, face serious and potentially even life-threatening consequences as a result of being denied treatment.  CADR has had dramatic, real-life success in helping patients in this precise situation, who called with what they thought were minor symptoms and found that their conditions were in fact more serious than they had realized.

85.     In addition, even for patients who are diverted from telehealth to a traditional physician's office, these patients will face more than simply increased costs:  patients will be forced to incur travel time and inconvenience as a result of the elimination of telehealth.  For patients in underserved or rural areas, being forced to make an in-person visit to a physician

COMPLAINT - 13

when this is not medically necessary under the circumstances creates a real and inappropriate burden.

## VI.  DEFENDANTS' CONDUCT HAS HARMED COMPETITION, COMPETITORS, AND CONSUMERS

86.    The IBOM's discipline of Dr. DeJong had serious anticompetitive effects by excluding out of state telehealth providers from providing needed services and punishing Dr. DeJong for conduct engaged in by in state health care providers.

## VII. CLAIMS FOR RELIEF

## COUNT I

**Violation of the Sherman Act, 15 U.S.C. § 1 – Unreasonable Restraint of Trade**

87.    Dr. DeJong incorporates by reference paragraphs 1 – 86.

88.    IBOM agreed to take the many anticompetitive actions detailed above, including its discipline of Dr. DeJong.

89.    These actions have in the past and would in the future unreasonably restrain trade by dramatically restricting telehealth services in Idaho by driving CADR and Dr. DeJong out of Idaho.

90.    These actions have the anticompetitive effects detailed above, including raising prices and reducing the output of physician services, and causing Dr. DeJong economic harm.

91.    These actions have caused harm and threaten to cause irreparable harm to Dr. DeJong.

## VIII.  DEMAND FOR JURY TRIAL

92.    Dr. DeJong demands a trial by jury of all issues so triable in this case.

COMPLAINT - 14

## IX.  PRAYER FOR RELIEF

THEREFORE, Dr. DeJong prays for relief as follows:

1.      An award of $1,000,000.00 as damages for IBOM's anticompetitive conduct.

2.      Declare that IBOM's discipline of Dr. DeJong is void and invalid.

3.      Award Dr. DeJong her costs of suit, including attorneys' fees and expenses, as provided by law.

4.      Such other relief as the nature of this case may require or as the Court deems just and proper.

DATED this 6th day of November, 2017.

ELAM & BURKE, P.A.


By: _____
Joshua S. Evett, of the firm
Attorneys for Dr. DeJong

4828-6761-9663, v. 3

COMPLAINT - 15